**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
----------------------------------------------------------X
NADINE DYER,

                Plaintiff,

- against -

HOPKINS CENTER FOR REHABILITATION
AND HEALTHCARE,
                Defendant.
----------------------------------------------------------X

Case No.

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff, Nadine Dyer, (hereinafter "Plaintiff" or "Ms. Dyer"), by her attorneys, FILIPPATOS PLLC, hereby complains of Defendant, Hopkins Center for Rehabilitation and Healthcare, ("Defendant" or "Hopkins Rehab"), upon personal knowledge, as well as information and belief, by alleging and averring as follows:

**PRELIMINARY STATEMENT**

1. Plaintiff brings this action against Defendant for violations of the anti-retaliation protection provisions of the Federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.* (hereinafter the "FCA"), as well as its New York State analog, the New York False Claims Act, N.Y. State Fin. Law, §§ 187 *et seq.* (hereinafter the "NYFCA"), and for violations of the Family and Medical Leave Act, 29 §§ 2601, *et seq.* ("FMLA").

2. As more fully alleged herein, Defendant unlawfully terminated Plaintiff's employment because she complained about the fraud committed by Defendant against the United State government, as well as the State and City of New York – i.e., securing patient referrals or other business interests by (a) primarily (but not exclusively) offering remuneration (through money or other things of value), which exchange involved, in whole or in part, federal health care programs and (b) relatedly submitting false Medicaid

claims. Moreover, Defendant's unlawful termination of Plaintiff's employment constitutes a violation of the applicable federal and state statutes cited herein; accordingly, the Complaint seeks the full panoply of relief provided by these statutes.

### THE PARTIES

3. Defendant is a domestic not-for-profit corporation organized under the laws of the State of New York, with its principal place of business and headquarters located at 155 Dean Street, Brooklyn, NY 11217.

4. Plaintiff is an adult citizen of the United States of America and resident of Kings County within the City and State of New York.

### JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over this matter pursuant to 29. U.S.C. §§ 2617, 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a), since the claims contained in the Complaint arise from violations of laws of the United States of America and the State of New York.

6. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a) because those claims are so related to the federal claims contained in this action, which are within the original jurisdiction of the Court, that they form part of the same case or controversy under Article III of the United States Constitution. Jurisdiction over Plaintiff's NYFCA claim is also invoked pursuant to 31 U.S.C. § 3732.

7. This Court has personal jurisdiction over Defendant pursuant to 31 U.S.C. § 3732(a) because Defendant is found, resides, or transacts business in the Eastern District of New York; moreover, 31 U.S.C. § 3732(a) further provides for nationwide service of process.

8. Venue is proper in the Eastern District of New York under 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732 because Defendant conducts business, and some or all of the actions or omissions giving rise to Plaintiff's claims occurred, within this judicial district.

## NATURE AND OVERVIEW OF THE CASE

9. Defendant is a domestic not-for-profit corporation that provides rehabilitative and palliative care, including long-term nursing care for medically complex patients.

10. At all times relevant herein, the care provided by Defendant was funded (at least in part) by the federal government, as well as the City and State of New York, through Medicaid payments received by Defendant.

11. While employed by Defendant, Plaintiff obtained information indicating that Defendant engaged in fraudulent conduct by offering to pay remuneration -- in the form of pre-paid gift cards -- in exchange for patient referrals or other business opportunities involving, in whole or in part, federally funded health care program – i.e., Medicaid.

12. These practices not only put Defendant and its staff at risk but deprived the patients who were under Defendant's care of their full measure of benefits under Medicaid.

13. Soon after Plaintiff complained about these fraudulent practices to Defendant's management, Defendant summarily fired her.

## SPECIFIC FACTUAL ALLEGATIONS

*Plaintiff is Hired by Defendant*

14. After an extensive interview process, on or about May 18, 2018, Plaintiff was hired by Defendant for the position of Director of Admissions to oversee the Admissions Office of Defendant. In this position, Plaintiff was compensated with a salary of $112,500, annually.

15. At all times relevant herein, Plaintiff's direct supervisor was Ari Donowitz, Administrator at Hopkins Rehab.

16. At all times relevant herein, Catherine Friedman was the HR Director at Hopkins Rehab.

17. At all times relevant herein, Christhian Rivera was the Corporate Compliance Officer at Hopkins Rehab.

18. At all times relevant herein, Shlomo Levi was the Regional Director of Operations at Hopkins Rehab.

19. At all times relevant herein, Don Coyne, Esq., acted as legal counsel to Hopkins Rehab.

20. Mr. Donowitz commenced working at Defendant in or around November 2020 and became Plaintiff's direct supervisor at that time. During her nearly three years of employment at Defendant prior to Mr. Donowitz's arrival, Plaintiff received numerous compliments from her former supervisor, Susan Rice, on her performance and work ethic.

21. However, a few days after he joined Defendant as Administrator, Mr. Donowitz threatened to demote Plaintiff because she did not attend a meeting. Based on Plaintiff's understanding of Defendant's policies, Plaintiff was unable to attend this meeting due to a lack of coverage in the Admissions Office, which she explained to Mr. Donowitz.

***Mr. Donowitz Instructs Plaintiff to Admit HMO Medicare Patients Who Did Not Have a Contract with Defendant, Disenroll Them from Their Coverage and Enroll Them in Nursing Home Medicaid Pending So They Would Qualify for Coverage at Hopkins, and Enroll Them in "Straight Medicare" on the First of the Month.***

22. Notwithstanding that Defendant had few contracts with insurance carriers, Defendant's policy was to deny referrals of patients whose insurance carriers did not have a contract with Hopkins Rehab.

23. After Mr. Donowitz became Plaintiff's supervisor, he demanded to know why Plaintiff was rejecting referrals of patients whose insurance carriers did not have a contract with Hopkins. When Plaintiff explained that these patients had insurers who were out of network and did not have contracts with Hopkins, and that therefore Hopkins could not take them in, Mr. Donowitz said to Plaintiff, in sum and substance, "that's why we're so behind compared to Bensonhurst and all the other facilities!" Mr. Donowitz then told Plaintiff, "I'll pay for the ambulance transportation here," before telling Plaintiff that he would disenroll patients from their primary Medicare HMO insurance during their stay at Hopkins -- which Hopkins did not accept -- and apply for nursing home Medicaid pending, and then enroll them in "straight Medicare" on the first of the month, which Hopkins accepted. Plaintiff told Mr. Donowitz that her previous supervisor, Ms. Rice, had told her that this was not permitted. However, Mr. Donowitz said he did not care.

24. Plaintiff knew that this scheme of enrolling HMO Medicare patients in Medicaid to qualify them to stay at Hopkins Rehab until they had non-HMO Medicare was unlawful. Indeed, Plaintiff spoke to Chris [last name unknown], Defendant's HMO Coordinator, about this unlawful scheme in December 2020.

***Mr. Donowitz Tells Plaintiff to "Bring In" Medicare Patients Using American Express Gift Cards; Plaintiff Complains to Defendant's HR Director.***

25. At approximately 4:30 PM on January 7, 2021, Mr. Donowitz told Plaintiff that, starting the next day, January 8, 2021, she would be sent "into the field" to do "marketing," despite Plaintiff never having been expected to engage in marketing work before, nor having received any training to do so. Mr. Donowitz further informed Plaintiff that beginning immediately, another Hopkins Rehab employee, Eileen Hennesy, would fill the role of

5

Acting Director of Admissions. Plaintiff explained to Mr. Donowitz that she had no experience with marketing and did not know where to go (or how) to carry out this marketing task because hospitals in the area were not allowing vendor visits due to the ongoing COVID-19 pandemic.

26. Shockingly, Mr. Donowitz told Plaintiff that she should "ask a marketer" and "force" her way into the hospital if it came to that.

27. A short time later, Mr. Donowitz asked to see Plaintiff in his office for updates regarding her marketing efforts. During this meeting, Mr. Donowitz gave Plaintiff three $100 American Express gift cards and ordered her to "give them out." Specifically, Mr. Donowitz told Plaintiff to "bring in" three Medicare patients using these gift cards. Plaintiff believed Mr. Donowitz's request was unlawful, yet being highly uncomfortable with him, she felt too afraid to report the incident to HR at the time. Instead, Plaintiff decided to hold onto the gift cards and tell Mr. Donowitz that she had given them away; Plaintiff decided upon this course of action because she feared Mr. Donowitz's retaliation if she did not give out the gift cards as he had ordered her to do.

28. Plaintiff also noticed around this time that fellow Hopkins Rehab employees had been responding to emails in her name and using her credentials in the office, while Plaintiff was working in the field.

29. On January 13, 2021, still troubled by Mr. Donowitz's request that Plaintiff "bring in" three Medicare patients using $100 gift cards, Plaintiff filed two complaints with Defendant's corporate office. First, Plaintiff called the Compliance Hotline and told them that, during her absence beginning on January 8, 2021, some of her co-workers were using her

workplace email account/credentials. Upon information and belief, this complaint was directed to Ms. Friedman, HR Director at Hopkins Rehab.

30. In addition, Plaintiff sent a letter, dated January 13, 2021, directly to Ms. Friedman, which detailed several uncomfortable instances she had experienced with Mr. Donowitz, including when Mr. Donowitz had given Plaintiff three $100 American Express gift cards to be given out to social workers in exchange for Medicare patient referrals. Plaintiff's letter directly raised the concern that the Hopkins Center Code of Conduct Handbook, as well as Plaintiff's understanding of applicable laws, strictly prohibited the giving or receiving of any form of payment, kickback, or bribe to induce the referral of patients to Hopkins Rehab facilities. Moreover, Plaintiff made clear that she felt that she had no choice but to oblige Mr. Donowitz's orders -- despite their impropriety -- for fear of retaliation.

31. Indeed, Plaintiff made clear in her January 13, 2021, letter to Ms. Friedman that she felt intimidated, manipulated, and forced not to follow Hopkins's policies and procedures, and/or the applicable laws. Lastly, Plaintiff's letter informed Ms. Friedman that in March 2020, Plaintiff had contracted the COVID-19 virus, and, while she had since recovered, Plaintiff was left with various side effects such as the frequent need for urination. Plaintiff ended her January 13, 2021, letter by stating her concern that any continued work in the field would cause a serious medical issue for Plaintiff, as she now had limited access to restrooms throughout her workday.

32. The very next day, January 14, 2021, Christhian Rivera ("Mr. Rivera"), former Corporate Compliance Officer at Hopkins Rehab, called Plaintiff and told her that he would like to discuss her complaint to HR with her in person. Plaintiff initially agreed to this meeting, but ultimately called Mr. Rivera back and expressed that she was too emotional to meet

7

with him given everything that had transpired with Mr. Donowitz; indeed, Plaintiff informed Mr. Rivera that she felt threatened by Mr. Donowitz.

33. Later that morning, Plaintiff received a phone call from Don Coyne, Esq. ("Mr. Coyne"), whom Plaintiff later learned was acting as legal counsel for Hopkins Rehab. At the time, Mr. Coyne told Plaintiff that he wanted to speak with her regarding the complaint she had written to HR. Plaintiff repeatedly told Mr. Coyne that she did not feel comfortable talking to him over the phone without her own lawyer present. Plaintiff further explained that, before saying anything else, she would have to verify Mr. Coyne's identity with her employer -- to do this, Plaintiff placed a call to Ms. Friedman, who told Plaintiff that she was not familiar with Mr. Coyne. However, Ms. Friedman did verify that the RYTES Company, where Mr. Coyne works, was hired by Hopkins to legally represent them.

34. Plaintiff then reiterated to Ms. Friedman that she did not feel comfortable speaking to an attorney for Hopkins Rehab without her own attorney present. Ms. Friedman informed Plaintiff that she was within her rights to refuse to speak to Mr. Coyne without Plaintiff's own counsel present.

35. Later that day, Plaintiff called Mr. Coyne back and told him exactly what she had told Ms. Friedman. Mr. Coyne then asked Plaintiff if she wanted to speak to someone else in his office who was not a lawyer. Plaintiff told him "no," and informed him that she would get back to him the following Tuesday. Nevertheless, Mr. Coyne continued to try and persuade Plaintiff into telling him what had happened. Plaintiff repeatedly refused and insisted that she would call him back the following week after she had spoken with her attorney.

36. At 3:30pm that same day, Plaintiff received another phone call from Mr. Coyne, who sounded irate – not calm and professional as he had been earlier that day. Mr. Coyne told

8

Plaintiff that she had to speak with him "right now," that he had spoken to someone from HR at Hopkin Rehab, and that they had agreed that Plaintiff would have to talk to him. Threateningly, Mr. Coyne told Plaintiff that she was jeopardizing her job by not speaking to him. In response, Plaintiff reminded Mr. Coyne that she wrote a detailed letter to Ms. Friedman regarding her concerns, and re-iterated that she was not comfortable speaking further to him without her own attorney present.

37. After her phone call with Mr. Coyne, Plaintiff called Ms. Friedman again to tell her what had happened. Ms. Friedman told Plaintiff that she was unaware of what had taken place – she had not talked to anyone in the office. Ms. Friedman then asked for Mr. Coyne's contact information and reassured Plaintiff that she would reach out to him.

38. Approximately one week later, on or about January 21, 2021, Plaintiff received a phone call from Ms. Friedman asking if Plaintiff could come to her office the following morning. Ms. Friedman told Plaintiff in advance that the meeting would be kept confidential.

39. Plaintiff met with Ms. Friedman the next day. At the beginning of the meeting, Ms. Friedman asked Plaintiff what she "really wanted." Not sure what Ms. Friedman meant, Plaintiff asked if she could elaborate. Ms. Friedman explained to Plaintiff that Shlomo Levi ("Mr. Levi"), Regional Director of Operations at Hopkins Rehab, wanted to "settle" with her. Confused, Plaintiff told Ms. Friedman that she did not feel comfortable assigning a "dollar value" to this situation, as she had never been in a situation like this before. Ms. Friedman again asked Plaintiff to present a figure, to which Plaintiff repeated that she did not know. Ms. Friedman continued to push Plaintiff, offering: "ok, what about $5,000?"

40. By this point feeling harassed, Plaintiff responded to Ms. Friedman that $5,000 was less than her monthly salary.

41. Thirty minutes later, Mr. Levi arrived at Hopkins Rehab to meet with Plaintiff. Mr. Levi began his conversation with Plaintiff by explaining that he could "bump" the settlement up to $12,800 and add two months of medical insurance coverage as well. In addition, Plaintiff would be able to collect unemployment after two months. Mr. Levi told Plaintiff that the "settlement" he was offering was very generous considering that most people only get one week severance for each year worked, perhaps incorrectly assuming that Plaintiff had only worked at Hopkins Rehab for one year.

42. Plaintiff then reminded Mr. Levi that she had been working at Hopkins Rehab for almost three years. Mr. Levi once again informed Plaintiff that his settlement offer was very beneficial to her. In an attempt to persuade Plaintiff to accept his offer and resolve the matter immediately, Mr. Levi told Plaintiff that if the case were to go to court, it could take years, that attorney's fees could cost her over $10,000, etc.

43. Mr. Levi then sarcastically asked Plaintiff: "where's your lawyer" before telling her that Mr. Donowitz was planning to fire her. Plaintiff explained to Mr. Levi that it would be difficult for her to find another job in Brooklyn, to which Mr. Levi responded that Hopkins Rehab would give Plaintiff a reference letter. When Plaintiff asked Mr. Levi why Mr. Donowitz would not just fire her instead of treating her like this, Mr. Levi apologized for Mr. Donowitz's behavior.

44. Plaintiff ultimately refused Mr. Levi's settlement offer and Mr. Levi ended the meeting. Later that day, Ms. Friedman contacted Plaintiff to schedule another settlement meeting with Mr. Levi for the following Friday.

45. Given that Plaintiff became ill around the time of the scheduled second meeting, she requested sick leave, which was covered by the FMLA, for two days, and as a result, the

meeting was rescheduled for the first week in February. Present at the second meeting on February 1, 2021, were Plaintiff, Ms. Friedman, and Mr. Levi, who began the meeting by summarizing what had occurred at the last meeting, including Mr. Levi's offer in "settlement" of approximately $12,800 plus two months of insurance, as well as Plaintiff's rejection of that offer. Mr. Levi then stated that the offer was still standing, but that he would need a "yes or no" during this meeting.

46. Plaintiff told Mr. Levi that she would have to discuss the offer with her attorney first, to which Mr. Levi responded, "I don't deal with any attorney stuff." Mr. Levi then asked Plaintiff for the last time whether she would agree to his settlement offer. Plaintiff, once again, informed him that she wanted to speak with her attorney first. In response, Mr. Levi informed Plaintiff, then and there, that he was terminating her, effective immediately. When Plaintiff asked for her termination letter, Mr. Levi stated that Hopkins Rehab does not give out termination letters. Plaintiff was then humiliatingly escorted off the premises of Hopkins Rehab.

**C*ausation Based on Temporal Nexus Between Plaintiff's Protected Whistleblower Activity and Her Unlawful Termination as well as Subsequent Remedial Action by Defendant.***

47. Defendant unlawfully terminated Plaintiff's employment on February 1, 2021. Tellingly, Plaintiff was terminated by Hopkins Rehab a short time after she raised concerns about the legality of Defendant's conduct. Plaintiff was also terminated not even one week after going out on FMLA protected leave, which further indicates that she was retaliatorily terminated for attempting to engage in protected activity.

48. Specifically, Plaintiff raised concerns to both Mr. Donowitz and Ms. Friedman regarding unlawful "remuneration" in return for referrals or other generation of business.

11

Specifically, Plaintiff referred to the proffer of three $100 American Express gift cards to her for the purpose of giving them out to social workers in exchange for Medicare patient referrals.

49. Plaintiff sent a letter, dated January 13, 2021, directly to Ms. Friedman detailing these concerns, which made clear she felt intimidated, manipulated, and pressured to ignore Hopkins's policies and procedures, as well as applicable laws.

50. In short, Plaintiff shared her concerns with Mr. Donowitz, her supervisor and the Administrator at Hopkins Rehab, as well as Ms. Friedman, the HR Director at Hopkins Rehab.

51. Approximately three weeks later, Plaintiff was abruptly terminated and given no explanation by Defendant other than her refusal to accept Defendant's offer for "settlement" surrounding the concerns Plaintiff had raised to Ms. Friedman, Mr. Donowitz, and Mr. Levi.

52. In December 2020, Plaintiff also raised concerns about Mr. Donowitz's fraudulent scheme – i.e., disenrolling patients from their health insurance before enrolling them in Medicaid to qualify them to stay at Hopkins, and then re-enrolling them on their prior insurance -- with Chris [last name unknown], the Hopkins Rehab HMO Coordinator, as well as Mr. Donowitz himself.

53. The temporal nexus between Plaintiff's protected activity and the subsequent adverse action against her by Defendant amply establishes causation under the applicable statutes.

## AS A FIRST CAUSE OF ACTION FOR
## RETALIATION UNDER 31 U.S.C. SECTION 3730(h)

54. Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs of the Complaint as if fully set forth herein.

55. At all material times herein, Plaintiff was an employee of Defendant within the meaning of the FCA and as such she was covered by the whistleblower retaliation protections set forth in 31 U.S.C. § 3730(h).

56. Plaintiff performed all the terms and conditions of her employment in a satisfactory or exemplary manner.

57. Plaintiff harbored a reasonable suspicion in good faith that Defendant was engaged in unlawful activities that defrauded the Federal, State, and City governments as described herein.

58. Plaintiff reported these activities to Defendant's agents in an effort to stop the fraud.

59. At all material times, Defendant was aware of Plaintiff's actions.

60. In response to Plaintiff's activities, which were protected conduct under the FCA, Defendant wrongfully retaliated against Plaintiff for reporting the fraudulent practices that allowed Defendant to obtain government funds, including from the United States of America and the State and City of New York, contrary to the whistleblower protections of the FCA, 31 U.S.C. § 3730(h).

61. Specifically, Defendant violated the FCA, 31 U.S.C. § 3730(h), when it threatened and harassed Plaintiff, terminated her employment, and otherwise discriminated against Plaintiff regarding the terms, benefits, conditions, and privileges of her employment in response to her protected activities of exposing Defendant's fraud against the governmental entities cited herein.

62. Furthermore, the Federal "Anti-Kickback" statute, 42 U.S.C. § 1320a-7b(b), (the "Anti-Kickback statute"), forbids providing the knowing and willful payment of "remuneration"

in return for referrals or generation of business involving any item or service payable under a federal healthcare program. 42 U.S.C. § 1320a-7b(b).

63. The Anti-Kickback statute makes clear that "a claim that includes items or services resulting from a violation of [that statute] constitutes a false or fraudulent claim for purposes of" the FCA." 42 U.S.C. § 1320a-7b(g).

64. Defendant, by and through its agent Mr. Donowitz, violated the Anti-Kickback statute by providing Plaintiff with three $100 American Express gift cards to "give out", in order to "bring in" three Medicare patients to Hopkins' facilities, thereby directing the knowing and willful payment of "remuneration" in return for referrals or generation of business involving an item or service payable under a Federal healthcare program.

65. Plaintiff engaged in protected activity when she complained on January 13, 2021, to Ms. Friedman via letter which directly raised concerns about unlawful renumeration regarding the three $100 gift cards provided to her by Mr. Donowitz, and detailed her concerns that the Hopkins Center Code of Conduct Handbook, as well as her understanding of applicable laws, strictly prohibited the giving or receiving any form of payment, kickback, or bribes to induce the referral of patients to Hopkins facilities.

66. As a direct and proximate result of Defendant's unlawful and wrongful actions or omissions against Plaintiff, as described herein, Plaintiff has sustained injuries and damages, including, but not limited to: (a) loss of earnings; (b) loss of career opportunities; (c) mental and emotional distress; (d) loss of reputation and esteem in the community; and (e) loss of ordinary pleasures of everyday life, including the opportunity to pursue the gainful occupation of her choice.

## AS A SECOND CAUSE OF ACTION FOR
## <u>RETALIATION UNDER N.Y. STATE FIN. LAW SECTION 191(1)</u>

67. Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs of the Complaint as if fully set forth herein.

68. At all material times herein, Plaintiff was an employee of Defendant within the meaning of the NYFCA and as such she was covered by the whistleblower retaliation protections set forth in N.Y. Fin. Law § 191(1).

69. Plaintiff performed all the terms and conditions of her employment in a satisfactory or exemplary manner.

70. Plaintiff harbored a reasonable suspicion in good faith that Defendant was engaged in unlawful activity that defrauded the Federal, State, and City governments as described herein.

71. Plaintiff reported these activities to Defendant's agents in an effort to stop the fraud.

72. At all material times, Defendant was aware of Plaintiff's actions.

73. In response to Plaintiff's activities, which were protected conduct under the NYFCA, Defendant wrongfully retaliated against Plaintiff for reporting the fraudulent practices that allowed Defendant to obtain government funds, including from the United States of America and the State and City of New York, contrary to the whistleblower protections of the NYFCA, N.Y. Fin. Law § 191(1).

74. Specifically, Defendant violated the NYFCA, N.Y. Fin. Law § 191(1), when it threatened and harassed Plaintiff, terminated her employment, and otherwise discriminated against Plaintiff regarding the terms, benefits, conditions, and privileges of her employment in response to her protected activities of exposing Defendant's fraud against the governmental entities cited herein.

75. As a direct and proximate result of Defendant's unlawful and wrongful actions or omissions against Plaintiff, as described in this Complaint, Plaintiff has sustained injuries and damages, including, but not limited to: (a) loss of earnings; (b) loss of career opportunities; (c) mental and emotional distress; (d) loss of reputation and esteem in the community; and (e) loss of ordinary pleasures of everyday life, including the opportunity to pursue the gainful occupation of her choice.

## AS A THIRD CAUSE OF ACTION FOR
## INTERFERENCE AND RETALIATION
## UNDER THE FAMILY AND MEDICAL LEAVE ACT

76. Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs of the Complaint as if fully set forth herein.

77. Section 2612(D) of the Family and Medical Leave Act, states in pertinent part: "an eligible employee shall be entitled to a total of 12 work weeks of leave during any 12-month period. . . Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee."

78. Section 2615(a) of the Family and Medical Leave Act, states in pertinent part:

    Interference with rights.

    (1) Exercise of rights. It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter.

    (2) Discrimination. It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter

79. Upon information and belief, Plaintiff and Defendant Hopkins Rehab are both subject to the FMLA, respectively, as eligible employee and covered employer, as Plaintiff is a full-time employee who has worked for Defendant Hopkins Rehab for over one (1) year.

Additionally, Defendant Hopkins Rehab employs over 50 employees within a 75-mile radius.

80. Defendant Hopkins Rehab interfered with Plaintiff's rights under the FMLA by not providing the required documentation upon its knowledge that she would be needing to use leave under the FMLA; for not notifying Plaintiff that she could use leave; and for terminating her employment just one week after taking leave.

81. As such, Plaintiff has been damaged as set forth herein.

## **DEMAND FOR JURY TRIAL**

82. Plaintiff hereby demands a trial by jury.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendant as follows:

A. Declaring the acts and omissions complained of herein are in violation of the whistleblower protections contained in 31 U.S.C. § 3730(h);

B. Enjoining and permanently restraining Defendant from the violations of the whistleblower protections contained in 31 U.S.C. § 3730(h);

C. Awarding damages in an amount consistent with the evidence and according to proof, including, but not necessarily limited to, liquidated damages for two times the amount of back pay, interest on back pay, compensatory damages, and consequential damages as provided by 31 U.S.C. § 3730(h)(2);

D. Declaring the acts and omissions complained of herein are in violation of the whistleblower protections contained in N.Y. Fin. Law § 191(1);

E. Enjoining and permanently restraining Defendant from the violations of the whistleblower protections contained in N.Y. Fin. Law § 191(1);

F. Awarding damages in an amount consistent with the evidence and according to proof, including, but not necessarily limited to, liquidated damages for two times the amount of back pay, interest on back pay, compensatory damages, and consequential damages as provided by N.Y. Fin. Law § 191(1);

G. Directing Defendant to reinstate Plaintiff to the position she would have occupied, but for Defendant' discriminatory and retaliatory treatment; or, in the alternative, awarding Plaintiff front pay in an amount to be proven and determined at trial;

H. Declaring Defendant's acts against Plaintiff as willful, wanton, and malicious, and directing Defendant pay Plaintiff punitive or special damages in an amount to be proven and determined at trial;

I. Awarding interest on such damages at the legal rate from the date of judgment until paid;

J. Awarding Plaintiff all reasonable expenses that were necessarily incurred in the prosecution of this action, plus all reasonable attorneys' fees and costs, as provided by 31 U.S.C. §§ 3730(h), and N.Y. Fin. Law § 191(1) and;

K. Declaring that Defendant engaged in unlawful employment practices prohibited by the Family and Medical Leave Act, 29 U.S.C. §§ 2601, *et seq.*

L. Awarding damages to Plaintiff for all lost wages and benefits resulting from Defendant's unlawful discrimination and to otherwise make her whole for any losses suffered as a result of such unlawful employment practices;

M. Awarding Plaintiff compensatory damages for mental, emotional, and physical injury, distress, pain and suffering and injury to her reputation in an amount to be proven;

      N.  Ordering such other and further relief as the Court deems just and proper.

Dated: White Plains, New York
       March 1, 2022

                                              Parisis G. Filippatos
                                              **FILIPPATOS PLLC**
                                              Attorney for Plaintiff
                                              199 Main Street, Suite 800
                                              White Plains, NY 10601
                                              Tel: 914-984-1111
                                              Fax: 914-984-1111
                                              pgf@filippatoslaw.com

                                        By:  /s/ *Parisis G. Filippatos*
                                                Parisis G. Filippatos (PF-1593)